# IN THE COURT OF APPEALS OF IOWA

No. 20-1406
Filed February 3, 2021

**IN THE INTEREST OF A.W.,**
**Minor Child,**

**T.D., Mother,**
　　Appellant.
_____

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

The mother appeals the adjudication of her child as in need of assistance and the continued removal of the child from her care. **AFFIRMED IN PART AND REVERSED IN PART.**

Nicholas A. Bailey of Bailey Law Firm, P.L.L.C., Altoona, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Kimberly A. Graham of Graham Law Collaborative, Indianola, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Vaitheswaran and Greer, JJ.

**GREER, Judge.**

The mother appeals seeking a reversal of the juvenile court order adjudicating her child, A.W., a child in need of assistance (CINA). Alternatively, the mother seeks reversal of a portion of the dispositional order that continued removal of A.W. from her care.

**Facts and Earlier Proceedings.**

The family first came to the attention of the Iowa Department of Human Services (DHS) in September 2018. The family was receiving ongoing services from DHS throughout the mother's pregnancy with A.W., and three of A.W.'s half-siblings were removed from the mother's care before A.W.'s birth because of domestic violence, substance abuse, and instability.[1] Before A.W.'s birth and during time services were provided through DHS, the mother's history of drug use, arrests for domestic violence, and lack of progress, led to the removal at birth of one of A.W.'s half-siblings. So before A.W.'s birth the mother revealed she would give birth outside Iowa, possibly in Nebraska or Michigan, so DHS could not take the child and suggested she would sign parental rights over to a paternal aunt or grandmother. After the mother learned she would violate her probation if she left the State of Iowa she gave birth to A.W. at an Iowa hospital on April 7, 2020.[2]

Shortly after A.W.'s birth, DHS informed the mother and her attorney the department would seek formal removal of A.W. unless the mother made

---

[1] As of September 2020, the mother and father's parental rights to A.W.'s siblings were terminated. An appeal of this matter is pending in the Iowa Supreme Court, Case Number 20-1266.

[2] The mother left the hospital with the baby the day following the caesarean section birth.

arrangements to voluntarily place A.W. in another's care. The mother and her attorney exchanged emails with the assigned DHS caseworker over placement of A.W. with the paternal grandmother out of state. The caseworker's last email to the mother asked if she could have A.W. "go back" with the paternal grandmother on April 9, and the mother responded, "Yes, I can."

That same day, the juvenile court issued an order for temporary removal, placing A.W. in DHS custody for foster care placement, pending a hearing scheduled for April 17. The order included "that physical custody could not be placed with another relative because no appropriate relatives are known to" DHS. The juvenile court noted a CINA petition would follow.

On April 14, the State filed a motion requesting the juvenile court order DHS to pursue expedited placement of A.W. and another half-sibling with their paternal grandmother in Michigan under the Interstate Compact on the Placement of Children (ICPC). *See* Iowa Code § 232.158 (2020). The juvenile court approved the order and directed DHS to apply for provisional placement of A.W. and that half-sibling with their grandmother pending a home assessment by the State of Michigan. At this time, A.W. was in Michigan with the grandmother.

With the removal order still in place and a hearing set for April 17, DHS advised the grandmother and mother that A.W. needed to be back in Iowa for the hearing. One day before the hearing date, the mother moved to stay the removal order and suggested the grandmother could not bring A.W. back to Iowa in time for the removal hearing because of adverse weather. In her motion, the mother faulted DHS for creating confusion by seemingly giving the grandmother permission through emails sent on April 9 to take A.W. to Michigan. The juvenile

court held a contested removal hearing on April 17 and then denied the motion to stay removal on April 19. In its order, the juvenile court found it did not believe DHS agreed to allow the grandmother to take A.W. out of state, and, in any event, the proper procedures were not followed.

> The legal grounds for . . . granting the emergency removal have not changed. . . . The parents cannot safely care for the baby. The Court does not have reliable information re[garding] the paternal grandmother. Furthermore, the Court cannot safely place the baby in the grandmother's custody without an ICPC Report.

A.W. was returned to Iowa and placed in foster care with one of her siblings. And the removal hearing continued on April 27. On May 4, the juvenile court ordered continued removal of A.W. from both parents, finding:

> Removal is necessary to avoid imminent risk to the child's life or health. The Court believes the parents' abrupt decision to have the paternal grandmother take [A.W.] to Michigan was to try and thwart DHS's decision to request the Court remove [A.W.]. If the Court and/or DHS was not involved, [A.W.] would be back with the mother who repeatedly tested positive for drugs—yet denies responsibility— continues to violat[e] a Criminal No Contact Order and continues to engage in an unhealthy, domestic violence relationship with [the father].

Following a contested adjudication hearing in June, the juvenile court adjudicated A.W. a CINA under Iowa Code section 232.6(c)(2) and (n), and continued removal. The juvenile court listed concerns about the mother's lack of insight over her drug use and her propensity to engage in domestic violence. Next, the juvenile court held a contested dispositional hearing in July, and it issued an order in October confirming A.W. as a CINA and continuing removal of A.W. from

the mother's custody. The mother timely appealed the CINA adjudication and dispositional order.[3] The father is not a party to this appeal.

**Standard of Review.**

"We review CINA proceedings de novo." *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). "[T]he State bears the burden of proving its allegations by clear and convincing evidence." *In re L.H.*, 904 N.W.2d 145, 149 (Iowa 2017).

**Error Preservation.**

The State asserts the mother failed to preserve error on her first claim contesting the CINA adjudication order. But at the adjudication hearing she voiced her position resisting an adjudication. Then, at the dispositional hearing, the mother stated, "We are in agreement with all the recommendations except for we are asking the child be returned to the mother's care." So minimally, the record shows the mother firm on her conviction that removal of A.W. was unnecessary. Thus, we find the mother preserved error on her claim by contesting CINA adjudication at the June 3 adjudication hearing. The State concedes the mother preserved error on her alternative claim, challenging the juvenile court's order for continued removal of A.W.

---

[3] *See In re Long*, 313 N.W.2d 473, 476–77 (Iowa 1981) (noting the proper procedure to challenge adjudication is to appeal from the dispositional order following adjudication).

**Analysis.**

**I. Did the juvenile court properly adjudicate A.W. a CINA under section 232.2(6)(c) and (n)?**

The mother asserts the juvenile court erred in adjudicating A.W. a CINA because the State did not meet its burden of proof under Iowa Code section 232.6(c)(2) or (n).  Our court recently explained the requirements of a CINA adjudication under 232.6(c)(2):

> To adjudicate the [CINA] pursuant to Iowa Code section 232.6(c)(2), the State must show the child has "suffered or is imminently likely to suffer harmful effects as a result of" the parent failing to exercise a reasonable degree of care in supervising the child.  Harmful effects under 232.2(6)(c)(2) "pertain[] to the physical, mental, or social welfare of a child" and are "established when there was harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur."

*In re L.B.*, No. 20-1164, 2020 WL 6482087, at *2 (Iowa Ct. App. Nov. 4, 2020) (citation omitted).

To begin, at the dispositional hearing DHS recommended continuing the CINA adjudication and that the child remain in foster care.  And the mother concurred with "all recommendations," except for asking for A.W. to be returned to her care.  Citing the mother's "remarkable improvement," the child's guardian ad litem agreed with continuing the CINA adjudication, but offered that she "would join in the request that [A.W.] be returned to [the mother's] physical care today."

As a part of the record to be considered, the juvenile court took judicial notice of testimony from the hearing to terminate the parental rights of A.W.'s step-sibling held in June.  In October, the juvenile court upheld the CINA adjudication and the removal.  To support the findings, the juvenile court discussed the family's

long history and prior involvement with DHS. Of note, A.W.'s mother and father's (S.W.) history includes domestic violence[4] with the mother contacting S.W. before and after A.W.'s birth, despite a no-contact order. The juvenile court also described the mother's criminal history, including the mother's multiple violent encounters with A.C., father of one of A.W.'s siblings, throughout 2018 and 2019. As a part of the criminal history, in 2018 alone, she was arrested for violating a no-contact order, three separate assaults, driving while barred, theft, and child endangerment. In the child endangerment case, the mother left A.W.'s sibling alone in a vehicle while she tracked down that father in anger. Then in 2019, the mother continued to violate a no-contact order involving A.C.'s girlfriend, often with her children in tow.

But much of the record reflects actions before A.W.'s birth. In that vein, the mother complains "the State and juvenile court rely heavily on [the mother's] past performance, her criminal history, her probation status; however they do not rely upon facts grounded in current reality as to any current mental capacity or condition, or drug and alcohol use." She points to her engagement in substance-abuse treatment and therapy, and claims she had not used illicit drugs "for some months" at the time of adjudication. After testing positive for cocaine in February, the mother tested positive for alcohol on May 7 and missed several appointments for substance-abuse treatment in May. That said, "In determining the best interests of the child, 'we look to the parent['s] past performance because it may

---

[4] In December 2019, both parents were arrested for domestic assault. The criminal court issued a no-contact order between the mother and S.W. that month.

indicate the quality of care the parent is capable of providing in the future.'" *L.H.*, 904 N.W.2d at 149 (quoting *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997)).

First, the mother's relationship with A.W.'s father has been tumultuous and punctuated by violent incidents. The juvenile court found "the mother and father . . . continue in a toxic domestic violence relationship—which includes using drugs." Throughout these proceedings the mother has been dishonest with professionals about her relationship with A.W.'s father, and she has violated a no-contact order between them dozens of times. And there is evidence suggesting the mother violated the no-contact order in June.[5] In the past, the domestic assaults led to frequent arrests of the mother, a child endangerment charge against her, and exposure of the children to the violence. The harmful effects of those actions if continued bode poorly for the potential mental welfare of A.W. *See J.S.*, 846 N.W.2d at 42 ("Although chapter 232 does not contain a definition of 'harmful effects,' we have noted it 'pertains to the physical, mental or social welfare of a child.'" (citation omitted)). We find clear and convincing evidence demonstrates A.W. is imminently likely to suffer harmful effects as a result of the mother and father's toxic relationship. *See L.H.*, 904 N.W.2d at 152 (finding CINA adjudication under 232.2(6)(c) was proper where the child was continually exposed to domestic violence). We affirm adjudication under section 232.2(6)(c).

Turning now to CINA adjudication under section 232.2(6)(n), the State must prove by clear and convincing evidence the child's "parent's or guardian's mental capacity or condition, imprisonment, or drug and alcohol abuse results in the child

---

[5] An older step-sibling insisted that S.W. had made spaghetti for the family, including the mother, in late June 2020.

not receiving adequate care." From August to October 2019, the mother repeatedly tested positive for marijuana. DHS noted the mother waited two months to obtain a recommended substance-abuse evaluation following a positive test in August 2019. "After the evaluation, she repeatedly missed appointments and again tested positive for drugs. DHS remained concerned with her 'lack of follow through' with treatment." In February 2020, two months before A.W.'s birth, the mother tested positive for cocaine. Although she admitted testing positive for marijuana and cocaine, the mother refused to accept responsibility and for most of this record denied personally using either drug. Until recently, the mother's engagement in substance-abuse treatment has been spotty at best throughout these proceedings. Still, her substance-abuse treatment provider indicated in early June the mother made progress since A.W.'s birth: "Since end of April when we resumed testing following COVID changes, she has provided four negative UA's and the positive on 05/07 for alcohol . . . . She has been working on what I have been asking in sessions."

The record clearly demonstrates the mother has a history of substance abuse. It also shows she has made some progress since June 2020. We remain concerned with the mother's substance abuse and hope she continues to make progress. With that said, we find the State has not proven by clear and convincing evidence that the mother's substance abuse resulted in A.W. not receiving adequate care. *See In re M.S.,* 889 N.W.2d 675, 682 (Iowa 2016) (finding insufficient grounds for termination of parental rights where State failed to establish a nexus between father's drug use and an appreciable risk of adjudicatory harm to the child).

Because the record fails to show A.W. did not receive adequate care as a result of the mother's drug or alcohol abuse, we reverse the adjudication under section 232.2(6)(n). Given the mother's concurrence in the recommendation to continue the CINA adjudication and because we find a basis for that determination, we affirm the juvenile court under Iowa Code section 232.6(c)(2). The juvenile court wrote an eighty-one page ruling and had the benefit of observing this family navigate through years of support from DHS and other professionals. So even with no direct evidence of neglect or abuse of A.W., the record supporting removal of the step-sibling raises significant concerns to support the imminent likelihood of harm based on the history of domestic abuse and instability. The dispositional order provides the mother a chance to safely demonstrate her ability to care for A.W. *See In re A.M.H.*, 516 N.W.2d 867, 872 (Iowa 1994) (finding that the requirements of the dispositional order under the watch of DHS offered opportunity to change previous course of instability).

**II. Did the juvenile court err in continuing removal of A.W. from the mother's care?**

Iowa Code section 232.95(2)(a) outlines procedures for temporary removal of children from parental custody. Upon a removal hearing or CINA adjudication, the court may:

> Remove the child from home and place the child in a shelter care facility or in the custody of a suitable person or agency pending a final order of disposition if the court finds that substantial evidence exists to believe that removal is necessary to avoid imminent risk to the child's life or health.
>     (1) If removal is ordered, the court must, in addition, make a determination that continuation of the child in the child's home would be contrary to the welfare of the child, and that reasonable efforts . . .

have been made to prevent or eliminate the need for removal of the child from the child's home.

Iowa Code § 232.95(2)(a)(1). At final disposition, the court must "make the least restrictive disposition appropriate considering all the circumstances of the case." *Id.* § 232.99(4). As always, our most important consideration is the best interests of the child. *In re D.D.*, 635 N.W.2d 359, 362 (Iowa 2002).

The mother contends continued placement of A.W. in foster care was not the least restrictive disposition because, with the "blessing" of DHS, she had plans to place A.W. in a guardianship with her paternal grandmother in Michigan. Despite any legitimate confusion between the mother and DHS, the juvenile court, and DHS could not place A.W. in Michigan without a valid ICPC order. But at the time of the dispositional hearing, DHS was waiting on an update from the Michigan ICPC. But the more pressing question was if the mother could resume care of A.W.

To summarize her primary position, the mother argues, "Even if the Department could not allow [A.W.] to travel out of state without an ICPC, the State did not prove at disposition that [A.W.] needed to remain out of the [mother's] care." She points generally to engagement in therapy and substance-abuse treatment and claims her last positive drug screen was five months before the July disposition hearing. The treatment providers involved in the mother's care referenced her progress. Likewise, the guardian ad litem commended the mother's significant progress and agreed A.W. should return to the mother's care. We hope the mother continues to follow the positive path she has struck. Under the protective supervision of DHS with the conditions established by the juvenile court, the least

restrictive disposition *should* be the mother's home, but a few months of compliance does not assure success. *See In re T.A.T.*, 695 N.W.2d 334 (Iowa Ct. App. 2004) (finding parent demonstrated that while not always exemplary with compliance, she did eventually accomplish what was required of her so removal was inappropriate). Thus, based on our rationale for extending the CINA, we agree with the juvenile court that clear and convincing evidence supports continued removal. Even facing termination of her parental rights to A.W.'s step-siblings, the mother continued to interact with A.W.'s father despite a no-contact order being in place and their long history of domestic strife. Unlike the older step-sibling, A.W. would be unable to report the presence of her father or any domestic abuse that might result. We believe the mother and father's toxic relationship and continued involvement with one another creates an unsafe environment that could cause imminent risk to A.W.'s life or health. Thus, we affirm the juvenile court order continuing removal of A.W. from the mother's care.

**Conclusion.**

With our foremost concern being the best interests of the child, we affirm adjudication under the grounds set forth in section 232.6(c)(2) but reverse adjudication under section 232.2(6)(n). We affirm the juvenile court order continuing removal from the mother's care.

**AFFIRMED IN PART AND REVERSED IN PART.**